J-A32023-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: S.O.C.B., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: V.B., MOTHER | No. 1595 EDA 2014 |

Appeal from the Order entered April 28, 2014,
in the Court of Common Pleas of Philadelphia County, Family
Court, at No(s): CP-51-AP-0000022-2014; CP-51-DP-0002145-2011,
FID: 51-FN-004059-2011

| | |
|---|---|
| IN THE INTEREST OF: S.O.B., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: V.B., MOTHER | No. 1596 EDA 2014 |

Appeal from the Decree entered April 28, 2014,
in the Court of Common Pleas of Philadelphia County, Family
Court, at No(s): CP-51-AP-0000023-2014; CP-51-DP-0002144-2011,
FID: 51-FN-004059-2011

BEFORE:    PANELLA, OLSON, and FITZGERALD*, JJ.

MEMORANDUM BY OLSON, J.:                    **FILED JANUARY 26, 2015**

V.B., (hereinafter "Mother"), appeals from the decrees entered on April 28, 2014, that granted the petition filed by the Philadelphia County Department of Human Services (hereinafter "DHS") to involuntarily terminate her parental rights to her minor, female children, S.O.C.B., and S.O.B., who were both born in August 2011 (hereinafter "the Children"), pursuant to section 2511(a)(8) and (b) of the Adoption Act, 23 Pa.C.S.A. § 2511(a)(8) and (b), and from the orders changing the permanency goal

_____
* Former Justice specially assigned to Superior Court.

for the Children to adoption, pursuant to section 6351 of the Juvenile Act, 42

Pa.C.S.A. § 6351.[1]  We affirm.

As the trial court has ably explained, the underlying facts in this case

are as follows:

> On October 24, 2011, DHS received a General Protective Service [(hereinafter "GPS")] report, alleging that Mother had given birth to triplets at Albert Einstein Medical Center. . . . [The GPS report further alleged that S.O.C.B.,] S.O.B.[,] and a third sibling were born at 33 weeks gestation[] and that the third sibling was transferred to St.

---

[1] At the hearing, DHS moved to terminate Mother's parental rights with regard to section 2511(a)(8) and (b).  N.T. Hearing, 4/28/14, at 85. Although the trial court's decree provides that Mother's parental rights to the Children were terminated under section 2511(a)(1), (2), (5), (8), and (b), in its opinion entered on July 23, 2014, the trial court stated that Mother's parental rights were terminated under section 2511(a)(8) and (b), only. Trial Court Opinion, 7/23/14, at 5, 8, and 10.  The trial court also stated that the Children's father, B.G. (hereinafter "Father"), lives in Africa, and his whereabouts had been unknown to DHS.  *Id.* at 1-2 and 4.  At the commencement of the hearing on the petition to involuntarily terminate Mother's parental rights, the trial court excused the counsel who had been appointed to represent Father, as he had not been served with notice of the petition, and the trial court established a new hearing date as to the termination of Father's parental rights.  *See* N.T. Hearing, 4/28/14, at 9-16. Mother's counsel stated that she had discovered a week before the hearing on the termination of Mother's parental rights that Father had moved from Benin to Nigeria, and that counsel had obtained Father's address.  *Id.* at 9. At the termination hearing regarding Mother's parental rights, Mother indicated she lived in Benin, Africa when she became pregnant, and that Father currently resides in Nigeria, Africa.  *Id.* at 64.  On April 28, 2014, the trial court entered an order bifurcating the termination of parental rights petition as to Father, and continuing the hearing on the termination of Father's parental rights to July 21, 2014.  Father is not a party to this appeal. *See also In re Burns*, 379 A.2d 535, 541 (Pa. 1977) ("[n]othing in the Adoption Act requires that an agency, which has assumed custody of a child, must establish grounds for the involuntary termination of both parents, before it can obtain such a decree as to either.  When an agency having custody of a child petitions for termination of parental rights, the rights of the respective natural parents must be determined independently").

Christopher's Hospital Neonatal Intensive Care Unit [(hereinafter "NICU")] for further medical treatment. The report also alleged[:] that Mother would be receiving nursing assistance at home until the Children were two years old; that Mother [had] been leaving the Children in the care of various family friends; that [the] Children were presently with a family friend [named] K.S.; that Mother was not going to her Women, Infants[,] and Children [(hereinafter "WIC")] appointments; that Mother was not providing K.S. with financial support and the Children's medical cards through the Department of Public Welfare []; and[,] that Mother was not visiting the third sibling at [the] St. Christopher's Hospital [NICU]. The report further alleged that [the] Children's father resided in an unknown location in Africa. It was alleged that Mother ha[d] not taken [the] Children for medical treatment and that both Children were suffering from colds. This report was substantiated.

On October 25, 2011, DHS visited K.S. at her home. K.S. [informed DHS:] that the Children had been in her care since the beginning of October[] 2011; that she allowed Mother and [the] Children to reside in her home because they were homeless; that Mother was not financially supporting the Children; that Mother was not involved with the Children's care; that Mother left the home for hours or days at a time; and[,] that Mother had missed a WIC appointment and the Children had not received WIC formula. DHS left a message with K.S. requesting that Mother contact DHS.

On October 26, 2011, DHS learned that Mother had visited the third child on October 25, 2011. . . . On October 26, 2011, Mother admitted to DHS[:] that she had not been providing proper care to [the] Children; that she was homeless; and[,] that she did not have a plan for the Children's care. Mother stated that she did not have any family members to care for [the] Children. On October 26, 2011, DHS obtained an order of protective custody [] for the Children[] and they remained in the care of K.S. On October 26, 2011, DHS visited Mother. Mother stated to DHS that she did not want K.S. to continue to care for the [C]hildren. [As a result,] DHS placed the Children in foster care through Children's Choice, Inc. The third child

- 3 -

remained hospitalized. The identity of and whereabouts of [the] Children's father was unknown to DHS at that time. Mother refused to disclose Father's name or contact information to DHS and stated that Father resided in Africa.

At the shelter care hearing held on October 28, 2011, the [order of protective custody] was lifted and [the] Children's temporary commitment to DHS was ordered to stand. Mother was referred to the Clinical Evaluation Unit [] for a drug screen and dual diagnosis assessment. On October 31, 2011, Mother tested positive for marijuana at the [Clinical Evaluation Unit]. On November 4, 2011, the [trial] court found the Children to be dependent and fully committed them to DHS. [The c]ourt ordered the Children to be placed in the care of a family friend, [named] D.B., and [the court ordered] that Mother [was permitted to] have weekly supervised visitation with the Children. . . .

On January 24, 2012, the [trial] court took notice that Mother was compliant with the permanency plan. Mother was awarded weekly[] supervised visits at the agency and liberal supervised visits in the home of D.B. The [trial] court ordered Mother to attend the Achievement Reunification Center [(hereinafter "ARC") and to continue her] parenting classes, GED classes, employment, and visit[ation]. DHS was ordered to assist Mother with housing. . . .

On April 20, 2012, the third child died as a result of birth defects.

On April 23, 2012, a Family Service Plan [(hereinafter "FSP")] meeting was held. The Children's permanency objectives were to return to [Mother]. The FSP parental objectives were: to provide adequate and safe living conditions; to provide [the] Children with supervision at all times; to meet [the] Children's daily basic needs[,] including [providing the Children with] food and clothing[] and [to] correct or stabilize [the Children's] physical health, vision, hearing, or dental problems; and[,] to facilitate reunification by complying with appropriate services and recommendations. Mother participated in the FSP and signed the document on April 24, 2012. On April 24, 2012, the [trial] court took notice that Mother was substantially

compliant with the permanency plan. The [trial] court ordered that Mother's visitation [was to] continue as previously ordered and that she be re-referred to ARC.

On July 17, 2012, the [trial] court took notice that Mother had shown minimal compliance with the permanency plan. The [trial] court ordered that Mother continue with supervised visits in the foster home and that her unsupervised community day visits be suspended. The [trial] court took notice that Mother had reconnected with ARC and that she had been referred to [the] Achieving Independence Center [(hereinafter "AIC")]. Mother was ordered to continue to participate and comply with ARC and AIC. Mother resided with her father at the time of the hearing. . . .

On October 15, 2012, the [trial] court took notice that Mother continued to be minimally compliant with the permanency plan. The [trial] court took notice of [the] Children's [father's] name and that he resided in Africa. The [trial] court ordered that [Mother's] agency supervised [] visits [] may be modified to overnight, prior to the Children's next hearing, if appropriate. Liberal supervised visits in the home of the foster parents were ordered to stand. . . .

On October 26, 2012, [an] FSP meeting was held. . . . Mother did not attend this meeting.

On or around January 14, 2013, DHS learned that Mother was no longer residing in the home of her father and that she did not have stable housing. Mother was unable to work on her educational goals due to [her] lack of a stable residence. On January 14, 2013, the [trial] court ordered that Mother be referred to the Behavioral Health System for a consultation or evaluation specifically for grief counseling. . . .

On February 4, 2013, [an] FSP meeting was held. The FSP parental objectives were: to provide adequate and safe living conditions; to stabilize [Mother's] mental health problems; to learn and understand age appropriate behavior and expectations for [the C]hildren; to maintain relationship[s] between parent and child through regular

visitation and participation in placement activities; to obtain and complete job training and/or seek and maintain employment; to correct or stabilize physical health, vision, hearing, or dental problems; and[,] to facilitate reunification by complying with appropriate services and recommendations. Mother attended [the FSP meeting and] signed the FSP. [Father's] whereabouts were unknown to DHS.

On April 16, 2013, the [trial] court took notice that Mother was in moderate compliance with her FSP objectives and that DHS was willing to give her additional time to complete her FSP parental objectives. The [trial] court ordered [that] Mother's supervised [] visits [were] to continue and that planned unsupervised visits shall occur in the community; however, Mother would have to submit a planned activity to DHS once a week in advance of the visits. The [trial] court referred Mother to [the Behavioral Health System] for consultation. . . .

On July 15, 2013, the [trial] court took notice that Mother was in substantial compliance and ordered her visits to continue as arranged. DHS was ordered to make outreach to [the] Children's father. . . .

On October 7, 2013, the [trial] court took notice that Mother was in minimal compliance with the permanency plan. The [trial] court took notice that Mother had visited [the] Children sporadically. The concurrent plan for the [C]hildren was adoption. Mother had failed to comply with her objectives designed to facilitate reunification with her Children. Mother had failed to visit the Children consistently. The outcome of the visits depend[ed] entirely on Mother's mood. She struggle[d] to concentrate on the Children when she [did] visit. [At the time,] Mother reside[d] at Eddy's House, a nine[-]month program that assists with housing[,] GED, and employment. Father [] failed to parent the Children. Father's whereabouts were unknown to DHS; however, Mother stated that [Father] reside[d] in Benin, Africa.

[On January 14, 2014, DHS filed petitions to involuntarily terminate both Mother's and Father's parental rights to the Children. With respect to Mother, DHS sought to terminate

- 6 -

her parental rights pursuant to section 2511(a)(8) and (b)].
. . .

The [trial] court found Mother [minimally compliant on her FSP objectives] in the permanency review hearing[] that took place [on] January 31, 2014[.]

Trial Court Opinion, 7/23/14, at 1-5 (some internal capitalization omitted).

On April 28, 2014, the trial court held an evidentiary hearing on DHS's petition to involuntarily terminate Mother's parental rights. At the hearing, DHS presented the testimony of Courtney Ransome, its social services manager assigned to the family. N.T. Hearing, 4/28/14, at 20. DHS also presented the testimony of Adrianna Garcia, who is employed by Children's Choice as the agency caseworker. *Id.* at 37. Finally, Mother testified on her own behalf. *Id.* at 52.

Of note, during the hearing, Mother testified that she is still unable or unwilling to care for the Children. As Mother testified:

Q: [] And as far as the children are concerned, would it be your preference today that the children be reunified with you or that they go to live with their father in Nigeria?

A: Honestly –

Q: What is it you're looking to have happen?

A: Honestly, I'm not going to sit here and lie. No, I do not think my children should be with me at this very second today because at the end of the day, I'm 20. I'm still trying to get my life together. I'm still trying to finish school. I'm still trying to maintain the person that I am. I'm still trying to find me.

N.T. Hearing, 4/28/14, at 71.

- 7 -

Further, during the hearing, DHS social services manager Courtney Ransome testified: that Mother has been minimally compliant with her FPS goals; that "Mother has not made any substantial progress towards alleviating the circumstances that necessitated the original placement;" that the Children would not suffer irreparable harm if Mother's parental rights were terminated; and, that the Children would suffer serious harm if they were removed from the foster mother's home. *Id.* at 22-23, 26-27, 29, and 50. Children's Choice caseworker Adrianna Garcia also testified that the foster mother is willing to adopt the Children and that adoption would be in the Children's best interests. *Id.* at 41.

On April 28, 2014, the trial court entered its decrees involuntarily terminating Mother's parental rights to the Children pursuant to section 2511(a)(8) and (b), and changing their permanency goal to adoption pursuant to section 6351 of the Juvenile Act. On May 23, 2014, Mother timely filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

In her brief on appeal, Mother raises four issues, as follows.

> 1. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating [Mother's] rights and changing the goal for [the Children] to adoption where [DHS] failed to prove by clear and convincing evidence that grounds for termination existed under 23 Pa.C.S.A. § 2511(a)(8)?
>
> 2. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating [Mother's] parental rights and changing the goal for [the Children] to adoption

where the reasons for termination were environmental factors beyond [Mother's] control?

3. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating [Mother's] parental rights and changing the goal for [the Children] to adoption where [DHS] failed to prove by clear and convincing evidence that involuntar[y] termination [of Mother's] parental rights would best serve the emotional needs and welfare of [the Children] under 23 Pa.C.S.A. § 2511(b)?

4. Did the trial court commit an error of law and abuse of discretion by involuntarily terminating [Mother's] parental rights and changing the goal for [the Children] to adoption without fully considering the impact of termination on the emotional needs and welfare of [the Children]?

Mother's Brief at 3-4.[2]

In her brief, Mother asserts that she is a 20-year-old, single mother who, without any familial support, remedied all of the conditions that led to the placement of the Children, except for her housing situation. **See** Mother's Brief at 15. Mother claims that, because of her poverty, she was unable to remedy her lack of stable housing despite her best efforts. **Id.** Mother asserts that her inability to obtain adequate housing was beyond her control, as she could not maintain permanent and suitable housing despite her completing the DHS-recommended housing course, residing in the shelter to which she was referred by AIC, and maintaining employment. **Id.**

_____

[2] We observe that Mother subtly changed the issues from those stated in her concise statement, but we find that she sufficiently preserved her issues for our review. **Cf. Krebs v. United Ref. Co.**, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that any issue not set forth in or suggested by an appellate brief's statement of questions involved and concise statement is deemed waived).

at 16. Mother urges that the termination is improper, as she has accumulated savings that will enable her to eventually secure suitable housing. *Id.*

Mother alleges that, although the Children were removed from her care and custody at the age of ten weeks, she has cultivated a strong emotional bond with them, and has assumed an important role in their lives. *Id.* at 15. Mother urges that the Children could benefit from the love, affection, and support that she can provide them in the future. *Id.*

Mother also contends that the record lacks clear and convincing evidence that the termination of her parental rights best serves the needs and welfare of the Children. *Id.* at 17. She relates this argument to section 2511(a)(8) and 2511(b). *See id.*

We review an appeal from the termination of parental rights under the following standard.

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As [the Pennsylvania Supreme Court] discussed in **R.J.T.**, there are clear reasons for applying an abuse of discretion standard of review in these cases. [The **R.J.T.** Court] observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead [appellate courts] must defer to the trial judges so long as the factual findings are supported by the record and the [trial] court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (some internal quotations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained:

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.*, *quoting In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section

- 11 -

2511(a).  **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

In the case at bar, the trial court terminated Mother's parental rights under section 2511(a)(8) and (b).  These subsections read:

> **(a) General rule**.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> . . .
>
> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

There is no dispute that the Children were out of Mother's care and custody for more than twelve months at the time of the hearing, as they were removed from her care and custody on October 26, 2011, and the

hearing on the termination petition, filed on January 14, 2014, was held on April 28, 2014. Thus, as this Court has explained,

> [o]nce the 12–month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of [the agency] supplied over a realistic time period. Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of [the Agency] services.

*In the Interest of K.Z.S.*, 946 A.2d 753, 759-760 (Pa. Super. 2008), quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1133 (Pa. Super. 2007).

After our careful review of the record in this matter, we find that the trial court's credibility and weight determinations are supported by competent evidence in the record. *In re Adoption of S.P.*, 47 A.3d at 826-827. The trial court properly considered the history of the case, including Mother's neglect as a parent to the Children, and her failure to complete the FSP objectives, particularly the housing, mental health, and visitation objectives, and determined that she would not remedy her failure to parent. Trial Court Opinion, 7/23/14, at 8.

The trial court also considered the best interests of the Children under section 2511(a)(8). The trial court noted that Mother admitted that she was unwilling or unable to assume her parental duties with regard to the Children. Trial Court Opinion, 7/23/14, at 8, *citing* N.T., 4/28/14, at 71. Mother cannot now shift the blame to DHS for her failure to parent the

- 13 -

Children. Accordingly, we find that the trial court's determinations regarding section 2511(a)(8) are supported by sufficient, competent evidence in the record.

After we determine that the requirements of section 2511(a) are satisfied, we proceed to review whether the requirements of subsection (b) are satisfied. *See In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*). This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *Id.* at 1008.

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court recently stated as follows.

> if the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "intangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993), the Pennsylvania Supreme] Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (some internal corrections omitted).

With respect to this issue, the trial court concluded:

When asked about Mother's compliance with her FSP objectives during the life of the case, [the] DHS social worker described compliance as minimal. In explaining the reasons for Mother's level of compliance, [the] DHS [social] worker testified that[:] Mother's housing is still unstable[;] Mother's mental health [issues have] not been addressed[;] Mother's visitation has been inconsistent[; and,] Mother is not currently attending mental health treatment[] and she has [historically] been inconsistent with [receiving mental health treatment]. . . . Mother's lack of compliance with her mental health [treatment] constitutes a major concern due to Mother's admission of her own current incapability to assume her parental role and duties. Consequently, the record clearly establishes that Mother's parental rights were not solely terminated based on environmental factors. . . .

The testimony of the social workers established that termination of [Mother's] parental rights is in the best interest of the Children. The Children do not depend for their needs on the biological Mother. Furthermore, the testimony demonstrates that the Children would not suffer irreparable harm[] if Mother's parental rights were terminated. [The] Children are attached to the[ir] foster mother because she is the primary caretaker that has been with them since the Children were placed in care. [The] Children did cry for their foster mother, the first time they were left in day care. No maternal bond exists with Children's biological Mother as the[ Children] do not seek her to satisfy their needs and the Children do not refer to her as "Mother" during visitations. In one of the last visits, [the] Children did cry and were a bit sad when Mother left but they did not cry for [very] long. In previous visits, before leaving, [the] Children hugged their biological Mother and then went back to what they were doing before she left. [The] Children recognize Mother to play, but not to be the primary caregiver. There is a bond, but it is not a parent/child bond. The foster [m]other has a strong influence on the Children and provides for all their needs. [Further, during the April 28, 2014 termination of parental rights hearing, Children's Choice caseworker Adrianna Garcia testified that the foster mother is willing to adopt the Children and that the adoption would be in the Children's best interests]. . . .

> The trial court determined that the testimony from DHS and agency workers was credible. Consequently, the court found it to be in the best interest of the Children to change the goal to adoption, and the bond between Mother and Children can be severed without irreparable harm.
>
> For the aforementioned reasons, the [trial] court finds that DHS met its statutory burden by clear and convincing evidence to terminate the parental rights of Mother pursuant to 23 Pa.C.S.A. § 2511(a) (8) and (b). The court also finds that it will not cause irreparable harm to the Children to sever any bond, and it is in the best interest of the Children since it would best serve their emotional needs and welfare.

Trial Court Opinion, 7/23/14, at 8-10 (internal record citations omitted).

The trial court found that the foster mother, not Mother, has provided for the Children's developmental, physical, and emotional needs and welfare, and that Mother will not be able to provide for their needs. Trial Court Opinion, 7/23/14, at 9. Further, there was sufficient, competent evidence from which the trial court properly found that the Children's primary attachment is with the foster mother, and there is no parental bond between the Children and Mother. *Id.* We have stated that, in conducting a bonding analysis, the court is not required to use expert testimony, but may rely on the testimony of social workers and caseworkers. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). This Court has observed that no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the child's life, and the resulting bond with the natural parent is attenuated. *In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008).

A parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. ***In re Z.P.***, 994 A.2d at 1121. We stated in ***In re Z.P.***, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." ***Id.*** at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of [her] child is converted, upon the failure to fulfill [] her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." ***In re B., N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004).

As there is competent evidence in the record that supports the trial court's credibility and weight assessments regarding the Children's needs and welfare, and the absence of any positive bond with Mother that, if severed, would cause the Children to be irreparably harmed, we conclude that the trial court did not abuse its discretion in terminating Mother's parental rights to the Children with regard to section 2511(b). ***See In re Adoption of S.P.***, 47 A.3d at 826-27. Accordingly, we affirm the termination decrees and the goal change orders.[3]

Decrees and orders affirmed.

---

[3] Mother does not support her contention regarding the change of permanency goal to adoption with any discussion or citation to statutory or case law. Mother has thus waived any challenge to the change of goal to adoption. ***See In re W.H.***, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) ("where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.").

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/26/2015